# IN THE COURT OF APPEALS OF IOWA

No. 24-1318
Filed October 16, 2024

**IN THE INTEREST OF D.S. and T.S.,**
**Minor Children,**

**D.S., Father,**
    Appellant.

_____

Appeal from the Iowa District Court for Linn County, Carrie K. Bryner, Judge.

A father appeals the termination of his parental rights. **AFFIRMED.**

Alexander S. Momany of Howes Law Firm, PC, Cedar Rapids, for appellant father.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Julie Gunderson Trachta, Linn County Advocate, Cedar Rapids, attorney and guardian ad litem for minor children.

Considered by Tabor, C.J., and Badding and Sandy, JJ.

**PER CURIAM.**

Before terminating the father's parental rights to his two children, born in 2013 and 2014, the juvenile court described him as "an adult throwing a temper tantrum to try to get his way." The court was referencing the father's decision in February 2023, after the children were adjudicated in need of the court's assistance, to step "away from the case as it [was] causing his mental health to decline." From then on, the father had no contact with the children, refusing supervised visitation even when it was offered to him. The court accordingly terminated his parental rights under Iowa Code section 232.116(1)(b), (e), and (f) (2024) and placed the children in the mother's custody under the protective supervision of the Iowa Department of Health and Human Services. The father appeals.

"We review termination of parental rights de novo." *In re A.B.*, 957 N.W.2d 280, 293 (Iowa 2021). Although we generally use a three-step analysis in our review, the father only challenges the first step—whether the State established a ground for termination by clear and convincing evidence. *Id.* at 293–94. So we confine our review to that step, *see In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010), concentrating on section 232.116(1)(f). *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (stating termination may be affirmed on any ground supported by the record).

On that ground, the father argues the State failed to prove that the children could not be returned to his custody because he "provided numerous exhibits which evidenced his relationship with the children, his ability to care for them, and the serious concerns that the children had about their mother and the care she

provided (or lack thereof)." *See* Iowa Code § 232.116(1)(f)(4) (requiring "clear and convincing evidence that the child cannot be returned to the custody of the child's parents . . . at the present time"); *D.W.*, 791 N.W.2d at 707 (interpreting the statutory language "at the present time" to mean "at the time of the termination hearing"). The father's argument continues a campaign that he started against the mother after she sought child support from him in April 2022.

The parents had been in an off-and-on relationship for a decade, according to the mother. Their relationship ended for good in February, when the father moved in with his new girlfriend. The father was "very irritated" that the mother wanted him to pay child support. After showing up to the mother's apartment late one night in mid-April, the father sent her text messages "that he wasn't in a good head space and really wants to hurt her." At the end of April, the father withdrew the children from school and kept them from the mother for several days, without making any plans for their medications or therapy appointments. Both children are diagnosed with attention deficit hyperactivity disorder and disruptive behavior disorder. The oldest is also diagnosed with oppositional defiant disorder.

The children were eventually placed back in the mother's physical care with visitation for the father through an emergency injunction granted by the district court. A subsequent temporary order continued that arrangement. Because the father was unhappy with the district court's temporary order, he stopped visiting the children from July through September 2022. During that time, the children's mental-health therapist noted that while she never saw the children's "oppositional defiant disorder go into remission," she did see "a significant improvement in behavior." The oldest child had "started to process Dad's words and behaviors in

therapy. . . . She began to say things like, 'Dad made us say that Mom hit us.'"[1]
But after the father started visiting the children again, the therapist observed "their behaviors had reverted completely"—at therapy, home, and school. The children's behaviors were so severe, according to the therapist, that there were safety concerns:

> By constantly telling lies about [the mother's] behavior, undermining her rules and telling the children they don't have to respect her, and using threats of moving to force the children to comply, [the father] is mentally injuring his children. They are behaving right now in ways that are unsafe and are at risk for even more dangerous behavior in the future.

Because of those behaviors, the department investigated a report in October that the father was emotionally abusive to the children. The child protective worker conducting the investigation spoke to other professionals involved with the children—including their psychiatrist, speech therapist, occupational therapist, and principal—who observed the same dramatic regression in the children's behaviors as their mental-health therapist did when the father resurfaced. The department's investigation resulted in a founded report of mental injury against the father, which was affirmed on administrative appeal.

The parents agreed to participate in voluntary services with the department. But by December, the father's behavior started interfering with the children's services. The children's psychiatrist would not see them anymore after the father recorded one of their appointments and refused to stop. The father was also

---

[1] There were five child protective assessments in 2022 and two in 2023. Most of the reports alleged that the mother was physically abusing the children—none of which were founded. The only founded report came in October 2022 against the father for mental injury, as will be discussed.

recording the children at the therapist's office. And he brought a gun into the waiting room, making individuals there feel unsafe. Finally, the father refused recommended behavior health intervention services for the children. The State accordingly filed child-in-need-of-assistance petitions, and the parents stipulated to the adjudications in January 2023.

At the beginning of February, the father returned the children early from a visit, telling the mother: "I'm relieving myself of this situation due to the stress and anger this is causing me. [The] kids are aware that they will be with you." That was the last time the father had any contact with the children. The juvenile court removed them from the father's custody at the end of February. The father was offered supervised visitation, but he refused, emailing the case manager: "There isn't a chance in hell that I'm going to accept or agree to supervised visitation. . . ."

With the father gone from their lives again, the children's behavior and mental health improved. The oldest child wrote a letter in October or November that said:

> I think a dad is someone who does their part and role and does not leave their children and come back like nothing ever happened also I love you as my dad but I do not respect your behavior and I can not forgive you for the way you have treated me [my brother] and mom . . . but I hope you will change your ways and come and meet us again also I have been having amazing days I also stop[p]ed l[y]ing I have been cleaner, more responsible and listen the first time[.]

Meanwhile, the father's behavior and mental health declined. After a hearing in September, a deputy notified the juvenile court "that the father was possibly recording himself in the hearing." The court entered an order prohibiting the father from bringing "a phone or recording device/equipment" into the

courtroom, though digital recordings of the hearings were available to him. Then, in January 2024, the father went to the emergency room because he was having homicidal thoughts about the mother and others involved in the juvenile case, including the judge and the department's case manager. The father was admitted to the hospital and released after a few days. The day after he was discharged, the court held a hearing on several motions the father had filed, including one requesting immediate return of the children to his care. The father refused to attend the hearing because he could not record the proceedings.

In denying the father's motions, the juvenile court found, "The father has not proven himself to be a safe, mentally stable parent at this point. As the Court cannot lessen the supervision requirement of visits, it absolutely cannot return custody of the children to the father." The court advised the father that he was

> in complete control as to how this case progresses. He can choose to participate in ordered services or not. If he continues to choose to be the victim and blame everyone else for juvenile court . . . oversight, he is wasting valuable time with his children and reunification will be difficult to achieve.

The father didn't listen to the court's advice, and the State petitioned to terminate his parental rights in February. The court granted that petition after a hearing in April. Although the father didn't attend the hearing, his attorney offered over thirty exhibits, which the court found were mostly recordings of the children "in everyday circumstances in [the father's] apparent attempt to catch them saying something bad about their mother. It is unimaginable the stress that the children likely felt on a regular basis with their father recording them for these reasons." *See In re N.M.*, 528 N.W.2d 94, 99 (Iowa 1995) (noting "with disapproval" the mother's "use of the children as pawns in her stormy relationship with" the father).

The father relies on those same exhibits on appeal, which he argues show the children expressing "concern about their mother and her unwillingness or inability to care for them appropriately." We disagree after reviewing the exhibits, the most recent of which is from November 2022. While many showed the children having fun with the father, in others he was coaching them on things about their mother, which caused the children's behavior to spiral out of control. *See id.* ("Rather than thinking first of the children's need for a stable and secure home, [the mother] continues to use visitation as an opportunity to disrupt and undermine the children's relationship with [the father] and [his] family.").

By the termination hearing, it had been more than one year since the father had any contact with the children, who thrived in his absence. *See A.B.*, 957 N.W.2d at 299–300 (affirming termination of father's parental rights under Iowa Code section 232.116(1)(h) where he sporadically participated in visitation); *accord In re A.U.*, No. 22-0949, 2022 WL 3906725, at *4 (Iowa Ct. App. Aug. 31, 2022). We agree with the juvenile court that rather than participating in services to address the concerns that brought the family to the department's attention, the father "focused on how 'wronged' he is, how the stress is damaging his mental health, and places himself as the victim of perceived threats, biases and racial attacks." Because the father did not participate in services, the children could not be returned to his custody. *See In re N.E.*, No. 24-1072, 2024 WL 4039646, at *3 (Iowa Ct. App. Sept. 4, 2024). We affirm the termination of the father's parental rights.

**AFFIRMED.**